**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>WINIMO REALTY CORP., *et al.*,<br><br>          Debtors. | Chapter 11<br>Case Nos. 92-B-40026 (RDD) through 92-B-40045 (RDD), inclusive<br><br>JOINTLY ADMINISTERED UNDER CASE NO. 92-B-40026 (RDD) |

**OPPOSITION TO OBJECTION TO PROOFS OF CLAIM OF**
**NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION**
**(CLAIM NOs. 69, 341, 343, 346, 347 AND 348)**

The New York State Department of Environmental Conservation ("DEC"), by its undersigned counsel, respectfully submits this opposition to the Objection to Proofs of Claim of DEC filed by Debtors on March 11, 2009 (the "Objection"). In support of this Opposition, DEC respectfully submits:

**Preliminary Statement**

1. Debtors' object to six proofs of claim filed by DEC: proofs of claim 69, 341, 343, 346, 347 and 348. For the following reasons, the penalty portion of two of these claims, proof of claim number 347 against debtor Oceana Terminal Corporation ("Oceana") and proof of claim number 348 against debtor Cibro Terminals Inc. ("Terminals"), are valid and fully enforceable. The remaining four claims, numbers 69, 341, 343, and 346, are no longer valid claims and DEC voluntarily withdraws them.

2. Claims numbered 347 and 348 each seek a $2,000,000 penalty and $2,065,000 in remediation expenses. Claim number 347 was filed against Oceana, and claim number 348 was filed against Terminals. These two proofs of claim are annexed to the accompanying affirmation of Todd D. Ommen ("Ommen Aff.") as Exhibits A and B. While Debtors are correct that the remediation expenses sought in each claim were ultimately borne by third parties and no longer represent claims against Debtors' estate, the $2,000,000 penalty reflected in the proofs of claim

is still owed by Oceana and Terminals pursuant to an Order on Consent, dated May 30, 1992 and signed by both entities (the "Consent Order"). *See* Ommen Aff., Exh. C, p. 13. This penalty is still fully due and owing, and accordingly, there is no basis for expunging DEC's claims insofar as they seek recovery of this $2,000,000.

## Background

3.  Through the 1980s and 1990s, Terminals owned and operated Major Oil Storage Facilities ("MOSFs") on Zeraga Avenue in the Bronx, New York, on Smith Street in Brooklyn, New York, and on Grand Street in Brooklyn, New York. In the Consent Order, Terminals conceded that it was responsible for petroleum spills and/or leaks from storage tanks at the Zeraga Avanue facility on or about November 18, 1987, at the Smith Street facility on December 10, 1987 and January 27, 1988, and at the Grand Street location over time on unknown dates through the 1980s and 1990s. *See* Ommen Aff., Ex. C, pp. 4-6, 8-12.

4.  Terminals and Oceana further conceded that Montauk Oil Transportation Corp. ("Montauk"), owned a barge named the Cibro Philadelphia, which discharged petroleum into the Hudson River near the Port of Albany on or about September 15, 1989 and into New York Bay on or about December 15, 1989. *See* Ommen Aff., Ex. C, p 12.

5.  The Consent Order further reflects that Oceana owned and operated an MOSF on East 149th Street in the Bronx, New York, and that Oceana was responsible for petroleum spills at that facility on November 28, 1986, March 24, 1990, and September 11, 1990. *See* Ommen Aff., pp. 6-8.

6.  In addition to being responsible for the foregoing spills and leaks, Oceana and Terminals also violated New York environmental statutes and regulations and the terms of licenses each held related to their respective MOSFs by, *inter alia*, failing to report the spills and

leaks, failing to contain the petroleum that spilled or leaked, failing to complete and submit various engineering reports to DEC related to the MOSFs, and failing to conduct required tests of the MOSFs. *See* Ommen Aff., Ex. C, pp. 4-12.

7. As a result of these various violations of law, Oceana, Terminals and Montauk jointly entered into the Consent Order on May 30, 1991. *See* Ommen Aff., Ex. C.

8. The terms of the Consent Order required Oceana, Terminals and Montauk to each conduct various remedial measures. *See* Ommen Aff., Ex. C, pp. 22-36. DEC agrees that obligations for these remedial measures ultimately were assumed by third parties.

9. The Consent Order further ordered Oceana, Terminals and Montauk to pay DEC a $2,500,000 penalty for the foregoing violations. *See* Ommen Aff., Ex. C, p. 13.

10. Of this $2,500,000 penalty, $500,000 was paid at the time of execution of the Consent Order. The remaining $2,000,000 was due and payable on the following schedule (*see* Ommen Aff., Ex. C, p. 13, par. I(A)):

| Amount | Date |
| --- | --- |
| $500,000 | May 30, 1992 |
| $500,000 | May 30, 1993 |
| $1,000,0000 | May 30, 1994 |

11. Oceana, Terminals and Montauk agreed to be jointly and severally liable for these penalties. Ommen Aff., Ex. C, p. 12, par. 96.

12. On January 3, 1992, Oceana, Terminals and their affiliates filed a petition for relief under Chapter 11 of the Bankruptcy Code, and none of the $2,000,000 owed under the Consent Order was ever paid to DEC.

3

13.     Accordingly, DEC filed, *inter alia*, proof of claim 347 against Oceana and proof of claim 348 against Terminals, seeking, in part, to recover this $2,000,000 penalty (collectively, the "Penalty Claims").

## **Discussion**

14.     Debtors raise three objections to the Penalty Claims, none of which have merit.

15.     First, Debtors argue that, because remedial action has been taken and completed at the MOSFs, "the Penalty portion of DEC Claim Nos. . . . 347 and 348 should be expunged." Objection, ¶¶ 18, 26.

16.     Debtors fail to explain what the completion of remediation has to do with the Penalties that Debtors expressly agreed to pay in the Consent Order. Nothing in the Consent Order makes the penalty payments contingent in any way on the completion of remediation. Rather, the Consent Order, under the heading "Penalties", assesses the penalty "[i]n partial settlement of the violations alleged" in the Consent Order. *See* Ommen Aff., Ex. C, p. 13.

17.     Thus, in voluntarily agreeing to the Consent Order, Oceana and Terminals agreed to pay $2,000,000 to DEC to resolve any penalties that could be assessed for their past violations of environmental statutes and regulations.

18.     Lest there be any doubt that the Penalty Claims are fully owing and not contingent on the failure to complete remediation, the Consent Order also provided for two separate penalties that <u>were</u> contingent on future remediation. First, the Consent Order provided for Stipulated Penalties in the event that Oceana or Terminals violated the Order (for example, by not completing remediation or improperly completing remediation). Second, the Consent Order provided for a "Suspended" penalty of $250,000, which was suspended "so long as Respondents shall remain in compliance with the terms of" the Consent Order and environmental laws, rules

4

and regulations.  *See* Ommen Aff., Ex. C, pp. 13-14.  The Consent Order expressly states that only the Stipulated and Suspended penalties are contingent on Terminals' and Oceana's compliance with the Order.  *See* Ommen Aff., Ex. C, pp. 14, 17.  Thus, it is plain from the Consent Order's terms that the "payable" penalty of $2,500,000 ($2,000,000 of which remains unpaid) was not contingent on compliance or lack of compliance with the terms of the Consent Order.

19.  Debtors' second argument appears to be that the proofs of claim do not include the $2,000,000 Penalty claims.  *See* Objection, ¶ 23.  The proofs of claim, along with the attachments thereto, make clear what DEC is claiming.  First, although Debtors are correct that the "Total" line on each proof of claim appears to be limited to the remediation costs, the "Unsecured" line on the face of each proof of claim reflects the $2,000,000 penalty.  Second, the summary page of Attachment A to the proofs of claim expressly states that DEC seeks a $2,000,000 penalty in addition to any remediation costs.  Third, both proofs of claim annexed the Consent Order, which expressly set forth the penalty due and owing to DEC.  *See* Ommen Aff, Exs. A, B.

20.  Moreover, Debtors have expressly *conceded* in papers filed with this Court that proofs of claim 347 and 348 included the $2,000,000 penalty claim at issue here.  Specifically, Debtors previously argued that DEC's proofs of claim 21 and 22 should be expunged because they were "redundant" of proofs of claim 347 and 348.  *See* Debtors' Fourth Omnibus Objection to (A) Duplicative Administrative Priority Proofs of Claim, (B) Amended, Replaced or Superceded [sic] Administrative, Secured and/or Priority Proofs of Claim, and (C) Redundant Administrative Proofs of Claim ("Fourth Omnibus Objection"), ¶ 13, Ex. D (attached to the Ommen Aff. as Exh. D).  Proofs of claim 21 and 22 expressly and separately sought the

$2,000,000 penalty also sought in proofs of claim 347 and 348. *See* Ommen Aff., Exs. E, F. In the Fourth Omnibus Objection, Debtors argued that the proofs of claim 347 and 348 "include the liability asserted in the 'Claims to be Expunged,'" which claims included proofs of claim 21 and 22. Ommen Aff., Ex. D, ¶ 13, ex. D. Thus, Debtors have *conceded* that the $2,000,000 penalty sought in proofs of claim 21 and 22 *was included* in proofs of claim 347 and 348. Having obtained expungement of proofs of claim 21 and 22 based on this representation, Debtors cannot now claim that the $2,000,000 penalty is *not* included in proofs of claim 347 and 348 as a basis for expunging those claims as well.

21. Finally, Debtors argue that the Penalty Claims should be expunged because this Court should not enforce claims based on penalties. Debtors cite three cases for this proposition, none of which support their premise.

22. First, Debtors cite and even quote authority based on a provision from the former Bankruptcy Act that was repealed and *not* included in the Bankruptcy Code. Specifically, Debtors quote from *In re Ross Nursing Home*, 2 B.R. 496, 497 (Bankr. E.D.N.Y. 1980), which, in turn, was quoting from Section 57(j) of the Bankruptcy Act. *See* Objection, ¶ 24. Section 57(j) provided that debts owing to the United States or any state "as a penalty or forfeiture shall not be allowed." *See In re Ross Nursing Home,* 2 B.R. at 497-98 (quoting former 11 U.S.C. § 93(j) (1976)); *see also* Objection, ¶ 24 (using same quote from section 57(j)). This section, however, was repealed and replaced in the Bankruptcy Code by section 726(1)(4), which expressly *allows* claims based on penalties. *See N.P. Mining Co., Inc.*, 963 F.2d 1449 (11th Cir. 1992) ("Section 57(j), since repealed . . . was replaced by section 726(a)(4) of the current Code, which allows prepetition punitive penalties . . .").

6

23. Debtors also cite the Second Circuit's opinion in *In re Parr Meadows Racing Ass'n, Inc.*, 880 F.2d 1540 (2d Cir. 1989) for the proposition that the Penalty Claims must be expunged because they are "not based on an actual pecuniary loss." Objection, Par. 24. This is not what *Parr Meadows* held. Quite the opposite. While the district court in *Parr Meadows* expunged the penalty claims because they did not reflect an "actual pecuniary loss," *Parr Meadows*, 880 F.2d at 1544 (quoting district court), the Second Circuit reversed this potion of the decision and held that, under section 726(a)(4), "after the secured creditors' and other, higher priority claims are satisfied, the county can recover its penalty claims from the estate." *Id.* at 1549. Thus, *Parr Meadows* actually stands for the opposite proposition than the one Debtors cite it for.

24. The only other authority cited by Debtors is *In re Klefstad*, 95 B.R. 622, 625 (Bankr. W.D. Wis. 1998), which stands for the general proposition that penalties are "not in harmony with the overall philosophy of the Bankruptcy Code," and should not be enforced. *Klefstad*, however, dealt with penalties on real estate taxes, not violations of environmental statutes or regulations, and this distinction is critical. Whatever validity this principle of disfavoring penalty claims may have in the context of real estate taxes, courts have repeatedly recognized that penalties based on violations of environmental statutes and regulations are enforceable in bankruptcy.

25. Indeed, in the context of the automatic stay, courts have made clear that governmental entities should be permitted to pursue environmental penalties against debtors. Under the Bankruptcy Code, the automatic stay does not apply to the "commencement or continuation of an action or proceeding by a governmental unit to enforce such unit's police or regulatory power." 11 U.S.C. 362(b)(4). Courts have consistently interpreted this section to

7

apply to actions seeking penalties against debtors for violations of environmental statutes, because such actions seek to protect the public heath, safety and welfare. *See, e.g., See In re Commerce Oil Co.*, 847 F.2d 291, 297 (6th Cir. 1988) (allowing action to proceed against debtor for civil fines and penalties for violations of environmental statutes); *United States v. Sugarhouse Realty, Inc.*, 162 B.R. 113, 116-17 (E.D. Pa. 1993) (allowing action against debtor for stipulated penalties under consent decree to go forward); *United States v. Mattiace Indus., Inc.*, 73 B.R. 816, 819-20 (E.D.N.Y. 1987) (allowing action seeking cleanup costs, civil fines, punitive damages and injuctive relief to go forward against debtors). Indeed, penalties for environmental violations serve as a deterrent that should not simply be wiped away in bankruptcy. As explained by the Eastern District of New York in allowing the United States Environmental Protection Agency to seek penalties against a debtor:

> Even where the United States seeks punitive damages or reimbursement of Superfund cleanup costs in addition to or in lieu of injunctive relief, thereby arguably protecting its own pecuniary interest, the deterrence function of the relief sought will render the action one to protect the public health, safety, and welfare. . . .

*Mattiace*, 73 B.R. at 819.

26. The basis for applying this regulatory exception to the automatic stay for environmental penalties is clear: the deterrent effect of such penalties would be severely compromised if the penalties were not enforceable in bankruptcy proceedings. Bankruptcy protections cannot enable financially troubled corporations to run roughshod over environmental laws with knowledge that such actions will not be punished after commencement of bankruptcy proceedings. "If one in precarious financial condition knows that any action to assess a fine will be stayed by the filing for bankruptcy, he will have little incentive to guard against

environmental pollution." *United States v. Standard Metals Corp.*, 49 B.R. 623, 625 (D. Col. 1985).

27. Thus, in enacting the Bankruptcy Code, Congress indicated that protection of the States' environmental regulatory powers is of at least equal, if not greater, importance than preservation of the debtors' assets. *See In re Commerce Oil*, 847 F.2d at 297 ("we decline to adopt Commerce's premise that preservation of the debtor's estate is of greater priority in the statutory scheme set forth by Congress in Title 11 than is the enforcement of environmental protection laws explicitly intended to be excepted from the automatic stay"). Indeed, the Ninth Circuit has explained "[t]he policy behind this 'police or regulatory exception' to the automatic stay is to prevent the bankruptcy court from becoming a haven for wrongdoers." *Commodity Futures Trading Comm. v. Co Petro Marketing*, 700 F.2d 1279, 1283 (9th Cir. 1983). Similarly, in the context of allowing an action for reimbursement of environmental response costs to go forward against a debtor, the Second Circuit explained, "[t]he need to continue such deterrent actions, despite the pendency of a bankruptcy action, furthers the purpose of the regulatory exemption to the automatic stay squarely: to avoid frustrating 'necessary governmental functions by seeking refuge in bankruptcy court.'" *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1024 (2d Cir. 1991).

28. The above reasoning that underlies excluding governmental pursuit of penalties for violations of environmental statutes from the protections of the automatic stay applies with even greater force in deciding whether to allow claims for such penalties. Were Debtors' position is adopted, it would establish a virtually *per se* rule against claims based on penalties for environmental wrongdoing. As such, any financially troubled entity would know that it will be freed from any assessed penalties by filing for bankruptcy protection, and will accordingly have

virtually no incentive to comply with environmental laws. This rule would unnecessarily put the public health and safety at risk, and it should not be adopted.

29. Indeed, what purpose would the exception to the automatic stay serve if the same penalties the government was permitted to impose during the automatic stay would simply be expunged during the claims resolution phase? Such an incongruous result could not be what Congress intended, and Debtors cite no support for this proposition. Rather, as stated above, Debtors' authority does nothing to support their arguments. As such, no basis exists for expunging the Penalty Claims.

## **Conclusion**

30. For the foregoing reasons, Debtors' Objection to the $2,000,000 penalty sought in proofs of claim 347 and 348 should be denied.

Dated: New York, New York
     April 14, 2009

                        Andrew Cuomo
                        Attorney General of the
                         State of New York

            By:    /s/ Todd D. Ommen
                    Todd D. Ommen (TO 1340)
                    Assistant Attorney General
                    New York State Department of Law
                    120 Broadway
                    New York, New York 10271
                    Tel. No.: (212) 416-8482
                    Fax No.: (212) 416-6007
                    todd.ommen@oag.state.ny.us